UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- )
KATHERINE CORTHON, on her own behalf  )
and on behalf of all other similarly situated  )
persons,  )
  )
             Plaintiff,  )
  )
     - against -  )     05 CIV 9685 (DC)
  )
VIACOM, INC.; VIACOM RETIREMENT  )     JURY TRIAL DEMANDED
COMMITTEE; WILLIAM A. ROSKIN; JOHN  )
R. JACOBS; MARY BELL; BRUCE LEWIS;  )
ROBERT G. FREEDLINE; LARRY ZINE;  )
KEITH M. HOLTZ; BARBARA  )
MICKOWSKI; DAN SUTTERTHWAITE;  )
PHILLIP P. DAUMAN; SUMNER M.  )
REDSTONE; RICHARD BRESSLER;  )
MICHAEL D. FRICKLAS; JOHN L.  )
MEUTHING; LINDA GRIEGO; JACKIE M.  )
CLEGG; JOHN F. ANTIOCO; PETER A.  )
BASSIE; ROBERT A. BOWMAN; GARY J.  )
FERNANDES; MEL KARMAZIN, VIACOM  )
RETIREMENT COMMITTEE and JOHN  )
DOES 1-10,  )
  )
             Defendants.  )
------------------------------------------------------- )

## AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff by her attorney, alleges upon personal knowledge as to her own acts and upon

information and belief as to all other matters, based upon the investigation of her counsel, which

included a review of news reports, press release, filings with the Department of Labor and the

Securities & Exchange Commission, individually and on behalf of all others similarly situated,

alleges as follows:

## I. INTRODUCTION

1.     This is a class action brought pursuant to §§ 502(a)(2) and (a)(3) of the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), against the

fiduciaries of the Blockbuster Investment Plan (the "Plan") for the violations of ERISA alleged herein.

2.      Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets from November 15, 2003 through the present ("Class Period").

3.      Specifically, Plaintiff alleges in Count I that the Defendants named therein responsible for the investment of the assets of the Plan, breached their fiduciary duties in violation of ERISA by failing to prudently and loyally manage the Plan's investment in Blockbuster stock by continuing to offer Blockbuster stock when the stock no longer was a prudent investment for participants' retirement savings.  In Count II, Plaintiff alleges that Defendants named therein who communicated with participants regarding the Plan's assets, or had a duty to do so, failed to provide participants with complete and accurate information regarding Blockbuster, its business plans, financial condition and the value and prospects of its stock as an appropriate investment for a retirement account sufficient to advise participants of the true risks of investing their retirement savings in Blockbuster stock.  In Count III, Plaintiff alleges that Defendants named therein, responsible for the selection, removal, and, thus, monitoring of the Plan's fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those who had conflicts of interest with plan participants and/or whose performance was inadequate.  In Count IV, Plaintiff alleges that the Defendants named therein breached their fiduciary duty of loyalty by acting in furtherance of their personal interests as employees or executives of Viacom and/or the majority shareholder of Blockbuster at the expense of the best interests of the Plan and its participants.  In Count V, Plaintiff alleges that

Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring.  In Count VI, Plaintiff states a claim for self-dealing against defendants Viacom, Inc. and Redstone.

4.     As more fully explained below, during the Class Period, Defendants imprudently permitted the Plan to hold and acquire millions of dollars in Blockbuster stock and failed to prevent Viacom from selling its own holdings of Blockbuster stock to Plan participants in exchange for participants' Viacom common stock.  They did so despite the fact that Defendants knew, or should have known, that Blockbuster was not a prudent and appropriate investment for participants' retirement savings.  As a result of Defendants' breaches alleged herein, the Plan and its participants suffered substantial losses.

5.     The acquisition and holding of Blockbuster stock and the exchange of participants' and the Plan's Viacom stock in exchange for Blockbuster stock was imprudent.  Defendants knew that under the direction of defendant Viacom, Inc., Blockbuster's business was operated for the short term benefit of Viacom rather than for long term benefits desirable for participants.  Viacom forced Blockbuster to borrow money to finance a one time dividend to return nearly one billion dollars to Viacom while saddling Blockbuster with an enormous debt load.  The debt left Blockbuster undercapitalized to finance all of the business initiatives which were planned to be introduced after Viacom had completed selling its entire stake in Blockbuster to Blockbuster plan participants and other Blockbuster shareholders.  Defendants also knew that Blockbuster planned several material changes in its business which put Blockbuster's financial condition and ability to general profits at undue risk particularly in light of Blockbuster's new debt burden.

6.     The Viacom-Blockbuster stock exchange and the declaration and payment of the special dividend also constitute violation of (1) ERISA fiduciaries' duties to act solely in the interests of the Plan and Plan participants and (2) ERISA's prohibition under 29 U.S.C. 1106(b) against self dealing and prohibiting the receipt of consideration by the fiduciary in connection with a transaction involving assets of the Plan.

7.     The breaches of fiduciary duty complained of herein are particularly egregious because of imprudent concentration of the Plan's assets in Blockbuster common stock which exposed participants' accounts to extraordinary losses.

8.     This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3)), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, the imposition of a constructive trust, restitution, and other monetary relief.

9.     Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the plan, Plaintiff brings this as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period.

10.     In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief.  At such time as Plaintiff has had the opportunity to conduct additional discovery and/or been provided with all copies of plan documents as required by ERISA and Department of Labor rules promulgated thereunder, Plaintiff will, to the extent

necessary and appropriate, amend her Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## II.  JURISDICTION AND VENUE

11.    Subject Matter Jurisdiction.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).  ERISA provides for nation-wide service of process.  ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them.

12.    Venue.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.

## III.  PARTIES

### A.    Plaintiff

12.    Plaintiff Katherine Corthon was an employee of Blockbuster and is a participant in the Blockbuster Investment Plan and continues to be a participant or beneficiary of the Plan, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a).

### B.    Defendants

#### 1.    The Viacom Defendants

13.    The Viacom Defendants include the directors of Viacom at relevant times during the Class Period.  The Viacom Defendants are named as defendants because under the BIP Plan documents, Viacom's Board of Directors had the power and exercised same to appoint members of the "Investments Committee" charged with responsibility for selection of investment

alternatives to be offered to Plan participants.  The Viacom Defendants also had the power and exercised same to appoint the Viacom Retirement Committee ("VRC") which was, at times during the Class Period, the Administrator of the Blockbuster Investment Plan.

14.     According to Blockbuster's Form 5500 for the calendar year ended December 31, 2003, the BIP's administrator was the "Viacom Retirement Committee" located at Viacom's headquarters at 1515 Broadway, New York, New York.  The Viacom Defendants were, to the extent indicated below, also officers and/or directors of Blockbuster and/or members of the various committees authorized by the BIP Plan documents.  Each of the Viacom Defendants who served both Viacom and Blockbuster was in position of irreconcilable conflict during the Class Period through the time of Viacom's complete divestiture of its Blockbuster stock and control over that Company.

15.     Defendant Viacom, Inc. ("Viacom") is a Delaware corporation with its principal executive offices located at 1515 Broadway, New York, New York.  Viacom was, until late October 2004, the owner of over 80% of the equity of Blockbuster.  Viacom's largest shareholder is Redstone who directly or indirectly owns 70.8% of Viacom Class A common and 6.5% of Viacom Class B Common.  Prior to Viacom's sale of Blockbuster stock to plan participants, only three of Blockbuster's directors could meet the independence requirements of the New York Stock Exchange.

16.     Defendant Sumner M. Redstone ("Redstone") was, at all times relevant hereto, Chairman of the Viacom Board and Chief Executive Officer of Viacom and was a directors of Blockbuster until Viacom's divestiture of its Blockbuster stock.  As Chairman, CEO and the largest shareholder of Viacom, Redstone was in a position to exert undue influence over

defendants Richard J. Bressler; Michael D. Fricklas and Mel Karmazin all of whom were
employees of Viacom during times relevant to this action.

17.     Defendants Richard J. Bressler, Michael D. Fricklas, Phillip P. Dauman and Mel
Karmazin were at all relevant times (until the spin-off) directors of Blockbuster while also
serving as directors and/or executive officers of Viacom. Defendants Bressler and Fricklas were
also members of the Blockbuster Investment Committee ("BIC") described below from
November 15, 2003 through March 11, 2004 .

18.     Defendant Viacom Retirement Committee ("VRC") and defendants John Does 1-
10 being members of the VRC at certain times during the Class Period.  As explained in more
detail below, the VRC was the administrator of the Blockbuster Investment Plan at all relevant
times and had general responsibility for the administration of the Plan.  At all relevant times, the
members of the VRC were, upon information and belief, all employees, officers, or directors of,
or appointed by, Viacom and/or Redstone.

### 2.     The Blockbuster Director Defendants

19.     Defendants Dauman, Redstone, John L. Meuthing, Linda Griego and Jackie M.
Clegg were, prior to Viacom's sale of Blockbuster stock to plan participants, members of the
Compensation Committee of Blockbuster whose function included overseeing the Blockbuster
Investment Plan, the BIC and BRC.

20.     Defendant Mel Karmazin was at all relevant times prior to the Viacom Exchange
a director of Blockbuster and until June 1, 2004 was an executive officer of Viacom.

21.     Defendants Peter A. Bassie, Robert A. Bowman and Gary J. Fernandes were
appointed to Blockbuster's Board of Directors after Viacom sold its Blockbuster shares.
Defendants Bassie, Bowman and Fernandes as members of the Blockbuster Board were endowed

under the Plan with fiduciary responsibilities for the appointment of, and oversight over the BRC and BIC and their respective members.

22.     Defendant John F. Antioco is Blockbuster's Chairman of the Board and CEO and has been since 1997. Defendant Antioco as a member of Blockbuster's Board was endowed under the Plan with fiduciary responsibilities for the appointment of and oversight over the BRC and BIC and their respective members.

23.     At present and since the December 2004 dissolution of Blockbuster's Compensation Committee, there is no standing committee of Blockbuster's Board of Director assigned to oversee the Blockbuster Investment Plan. Accordingly, the responsibility for such oversight of the Administrator of the Plan lies with Blockbuster Board of Directors, including defendants Clegg, Griego, Meuthing, Antioco, Peter A. Bassi, Robert A. Bowman; Gary J. Fernandes.

**3.     The Blockbuster Retirement Committee ("BRC")
And Blockbuster Investment Committee ("BIC") Defendants**

24.     Defendant Barbara Mickowski was a member of the VRC during the Class Period and a member of the BRC from November 15, 2003 to July 20, 2004.

25.     Defendant Keith M. Holtz was a member of the BRC from July 20, 2004 to October 16,2004 and has been a member of the BIC since July 14, 2005.

26.     Defendant Dan Sutterthwaite is a member of the BRC and has been since July 20, 2004; from December 11, 2003 through October 16, 2004 Satterthwaite was a member of the BIC.

27.     Defendant Robert G. Freedline was a member of the BIC from November 15, 2003 through March 11, 2004.

28.     Defendant Larry Zine was a member of the BIC from December 11,2003 through March 16, 2005 as well as Blockbuster's Chief Financial Officer..

29.     Defendant William A. Roskin was a member of the BRC from November 15,2003 to October 16, 2004 and a member of the BIC from November 15, 2003 to October 16, 2004.

30.     Defendant John R. Jacobs was a member of the BRC from November 15, 2003 to July 20, 2004.

31.     Defendant Mary Bell was a member of the BRC from July 20, 2004 to October 16, 2004 and a member of the BIC from July 29, 2004 through October 16, 2004.

32.     Defendant Bruce Lewis was a member of the BRC from November 15,2003 to July 20, 2004 and a member of the BIC from July 29,2004 through October 16, 2004.

## IV.  SUBSTANTIVE ALLEGATIONS

### A.     The Plan

33.     The Plan is a defined contribution 401(k) plan, which was adopted on February 8, 1999 and became effective on May 1, 1999, covering employees of Blockbuster and its participating subsidiaries.  The Plan is offered on a voluntary basis to all eligible full-time and part-time employees and is subject to the provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

34.     At all relevant times, the Plan had two separate components: (1) a contributory portion, which consisted of participant contributions, and (2) a matching component, which consisted entirely of employer contributions.

35.     From July 1, 2000 through December 31, 2004, employer matching contributions to the plan were automatically invested in the Blockbuster Stock Fund, which is invested solely

in shares of Blockbuster class A common stock. Until March 25, 2002, these contributions could not be transferred to any other investment fund offered under the Plan. Effective March 25, 2002, the Plan was amended to permit participants to transfer employer matching contributions originally invested in the Blockbuster or Viacom stock funds into any other investment fund offered by the Plan. The foregoing provisions contributed to the undue concentration of plan assets in Blockbuster common stock.

36.     The Plan provides that the employer's matching contribution is equal to (i) 100% of the first 3% of annual compensation contributed and 50 % of the next 2% of annual compensation contributed. All contributions made after January 1, 2001 are 100% vested at the time of contribution.

37.     From the end of 2002 through the end of 2004 , the rate of accumulation of Blockbuster stock in participants' accounts increased dramatically. At the end of 2002, the Plan held 544,815 shares of Blockbuster common stock. The number increased to 722,385 shares by the end of 2003 and to 1,122,537 shares by the end of 2004.

**B.     The Plan Documents And Allocation
Of Duties And Responsibilities Thereunder**

38.     An employee benefit plan, including the Plan here, must be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. 1102(a)(1). The Plan's terms and provisions are contained in The Blockbuster Investment Plan effective May 1, 1999, restated January 1, 2001 and the amendments thereto.

39.     According to the Plan, Blockbuster was the "sponsor" of the Plan as that term is defined in ERISA. The Plan is "administered" by a committee (the "Retirement Committee" or "BRC"), the members of which are appointed by the Board of Directors of the Company. The Board of Directors also appoints members of the committee (the "Investments Committee" or

"BIC") that has discretionary control over the management and disposition of the Plan's assets. The Retirement and Investments Committees are named fiduciaries of the Plan pursuant to the Plan.

40.    Also, according to the Plan Blockbuster's Board "shall initially appoint the members of the Retirement Committee." The proper officers of the Company may at any time remove or replace any members of the Retirement Committee. Pursuant to the Plan, during the Class Period through July 29, 2004, the BIC was charged with responsibility for selection of the investment alternatives to be offered to Plan participants. The Board of Directors of Viacom may at any time remove or replace any members of the Investments Committee.

41.    The Plan further provides: "The Retirement Committee, except for such investment and other responsibilities vested in the Trustee or investment manager or Investment Committee, shall have the specific powers granted to it herein and shall have such other powers as may be necessary in order to enable it to administer the Plan, including, but not limited to, the full discretionary authority and responsibility for administering the Plan in accordance with its provisions and under applicable law. The duties, powers and responsibilities of the Retirement Committee shall include, but shall not be limited to, the following:

(a)    To appoint such accountants, consultants, administrators, counsel, or such other persons it deems necessary for the administration of the Plan.

(b)    To take such steps as it considers necessary and appropriate to remedy any inequity resulting from incorrect information received or communicated or as a consequence of administrative error."

42.     Pursuant to an amendment to the Plan, effective July 29, 2004, the Blockbuster Board assumed responsibility for appointing members of the Investments Committee which committee retained exclusive authority to select investment funds for the Plan.

**C.      Blockbuster Stock Was Not A Prudent Investment
          Alternative For Participants During The Class Period**

43.     Blockbuster and its subsidiaries engage in the operation and franchise of stores whose main business is the in-store rental, sale and trade of pre-recorded videos and video games.  During the class period, Blockbuster operated approximately 9100 stores.  Blockbuster also operates Blockbuster Online, an internet service that allows customers to rent movies over the Internet for home delivery by mail.

44.     During 2003, Blockbuster's business was under substantial pressure from changes in consumer demand and competitive challenges.  Blockbuster was experiencing declining overall sales in the DVD retail rental market (Blockbuster's most profitable line of business and its cash cow); increased competition from mass market discount retailers particularly Wal-Mart; and increased competition from online Internet retailers particularly "Net-Flix.com" ("Netflix").

45.     In August 2003, to meet the competitive challenge of Netflix, Blockbuster adjusted its rental policy to eliminate a late charge only for its on-line customers.  The financial impact of this change in policy was not known to plan participants or the investment community at large because Blockbuster did not breakdown its rental revenues to reflect late fees.

46.     Shortly thereafter, Viacom began to explore the possibility of selling its Blockbuster stock.  In October 2003, Redstone publicly stated that Viacom, then trading at $45 per share, was "tremendously undervalued."  In November 2003 at an investor conference, Redstone and Viacom publicly stated that Blockbuster was not one of Viacom's "core" businesses.

47.    Viacom attempted to sell its Blockbuster stake to private equity investors. According to the Wall Street Journal, (December 2, 2003 edition), the private equity firms Blackstone Group, Quadrangle Group and Thomas H. Lee Partners were interested in acquiring Blockbuster.  Later Providence Equity Capital also reportedly expressed an interest.  By February 2004, talks involving the sale of Blockbuster had ended with all interested purchasers reportedly due to the fact that Viacom demanded a premium over market value for its Blockbuster shares.

48.    By December 2003, the perception of competitive pressures on Blockbuster's business was confirmed by Blockbuster's quarterly results:  financial results for the quarter ended December 30, 2003 was the second quarterly decline of Blockbuster's same store sales vs. comparable year ago periods.  Blockbuster's faltering results were the reason for the decline in the price of Blockbuster's stock price from approximately $30.00 in May 2002 down to approximately $17.50 in December 2003.

49.    With the prospects for a private sale of Blockbuster dead, Redstone and Viacom began to implement their plan to withdraw huge amounts of cash from Blockbuster and to devise a plan for Viacom to use its overvalued Blockbuster stock to buy back its undervalued Viacom stock.  Viacom was considering a spin off of Blockbuster because according to published reports, analysts said it would not be feasible for Viacom to sell its Blockbuster stock to the public because of a lack of demand for it.

50.    Once Viacom decided that Blockbuster would be sold, Viacom delayed the deployment of new initiatives at Blockbuster that would have had a negative effect on Blockbuster's financial condition; its ability to generate free cash flow; or which would have negatively affected Blockbuster stock price.  The new initiatives being planned were designed to

allow Blockbuster to maintain a competitive position with online DVD retailers NetFlix and Walmart.com.  By early 2004, three initiatives had been developed at Blockbuster:  (1)  offering all subscribers the chance to become monthly subscribers paying a flat fee for unlimited store rentals; (2) online rental subscription service; and (3) allowing subscribers to rent online or at stores.  However, Viacom would not allow these initiatives to be rolled out in 2003 or early 2004 because Viacom did not want Blockbuster to reinvest its cash in Blockbuster businesses. Moreover, Blockbuster and defendant Antioco began a high profile campaign of touting the benefits of the spin-off and Blockbuster's prospects after the spin-off.  The touting statements were designed to generate investor enthusiasm for Blockbuster stock which support and increase its trading price.  Viacom and Redstone, Blockbuster's parent company and Antioco's boss stood to benefit from such touting because Viacom planned to use its Blockbuster stock as currency to purchase Viacom stock in the exchange.

51.    Viacom also dictated cost cutting measures at Blockbuster to increase cash flow to Viacom at the expense of the roll-out of new initiatives at Blockbuster.  By December 2003, Viacom knew that Blockbuster's cost cutting measures had all been implemented and thus such measures would no longer allow Blockbuster to report growing cash flow.

52.    On February 10, 2004 Viacom announced that its board had approved a tax free spin off of its stock in Blockbuster in which Viacom investors, including plaintiff and other Plan participants who owned Viacom stock, would use their Viacom stock to purchase Blockbuster stock from Viacom.  At that time, the specific terms of the spin-off were not publicly announced. It was publicly reported, at the time, that Blockbuster's strategy of investing hundreds of millions of dollars into the video game rental business and online DVD rental business was not in the interests of Viacom.

53.     When it announced the possible spin off, Blockbuster also indicated that it may also consider issuing a special dividend which would increase debt and interest expense in the future.

54.     To allay investor concerns that Blockbuster's prospects might be faltering or uncertain, defendant Antioco reportedly said that threats to Blockbuster were "overblown" and opportunities "underestimated" and that the company's stock price did not reflect the "higher sales, improved profitability and reduction of debt achieved since 1999." In a statement issued by Blockbuster on February 10, 2004, defendant Antioco was quoted as follows:

> We believe Blockbuster will compete very effectively as an independent company and that separation from Viacom will enable us to better pursue our unique strategic vision and significant avenues for expansion. With our brand, our cash flow, and our growth opportunities, we are convinced that the prospects for our business are exceptionally strong.

55.     At the Viacom annual shareholders' meeting, in Spring 2004 Redstone extolled the benefits for Viacom of the exchange and admitted that it an "enormous stock buyback" of Viacom Stock using Blockbuster stock.

56.     Sophisticated investors understood that Blockbuster stock was not a viable investment and certainly not worth exchanging Viacom stock for Blockbuster stock. The Los Angeles Times in its June 12, 2004 edition, quoted two money managers who commented on the spin off. The Chief Investment Officer of Wilbanks, Smith & Thames Assets Management, Wayne Wilbanks reportedly said: "We wouldn't take the Blockbuster shares" . . . "Blockbuster is a dying business." Additionally, Richard Steinberg, president of Steinberg Global Asset Management reportedly said it would not exchange its Viacom shares for Blockbuster stock.

57.     At about that time, a Blockbuster spokesman, Randy Hargrove, was publicly quoted as assuring investors that if Blockbuster used debt to finance a special dividend it would not hinder the company's ability to run its business.

58.     On June 19, 2004 the terms of Viacom's sale of its Blockbuster stock for Viacom stock was announced:

(a)     Blockbuster would borrow over $1.45 billion and pay a $5 special cash dividend on each of its shares.   Viacom would receive $738 million of the special dividends;

(b)     Viacom would offer its Blockbuster shares in exchange for Viacom shares.

59.     The special dividend favored Viacom far more than it favored plan participants: the dividends received by Viacom were tax free under applicable corporate tax laws.  However, the dividends were taxable to Blockbuster Plan participants as ordinary income albeit tax deferred.

60.     In or about June 19, 2004, it was publicly reported that defendant Redstone, appearing on CNBC, said he "should have said goodbye" to Blockbuster a few years ago.

61.     By June 2004, Blockbuster's stock value was down more than 30% since October 2003.  During that same period the Standard & Poors 500 index rose approximately 10%.  In June 2004, defendant Antioco was publicly quoted:  "we believe that by becoming a separate company, we will be better able to pursue our retailing strategy."  In a letter to Blockbuster shareholders on June 18, 2004, defendant Antioco stated:  "As a fully independent company we were looking forward to accelerating our transformation into a specialty retailer of home entertainment."

62.     By the end of the first half of 2004, Blockbuster's free cash flow (cash flow after capital spending) dropped from $88 million to negative $9.6 million.  Nonetheless, on July 22, 2004, when Blockbuster reported revenues and quarterly net income of $0.26 per share, defendant Antioco clearly stated that the Company was successfully transitioning from a "video rental company" to an "entertainment destination," and that "we remain on track or ahead of schedule with all our strategic initiatives."

63.     In connection with the Exchange Offer, on August 20, 2004, defendants announced that the Board of Directors of Blockbuster had declared a "special cash dividend" of $5.00 cash per share of common stock, payable September 3, 2004, to stockholders of record at the close of business on August 27, 2004.  According to defendants' release, the special dividend was financed from the net proceeds of a $300 million 9% senior subordinated note offering, due 2012, and the borrowings of $650 million in term loans under a new $1.15 billion bank credit facility, both of which closed the same day as defendants' announcement of the dividend. Because Viacom owned 81.5% of the common stock of Blockbuster at the time, the special dividend resulted in a cash payment of $738 million directly to Viacom.

64.     Payment of the special dividend immediately reduced the price of Blockbuster shares from approximately $13.00 per share to $8.00 per share and caused Blockbuster, which had been virtually debt free, to incur approximately $900 million of debt, net of cash.  Prior to the close of the Exchange Offer, defendant Antioco publicly stated that this additional debt would not adversely impact the Company, and Antioco was quoted in the Financial Post as stating that Blockbuster carried less debt than it did at the time of its 1990 IPO and that, "We have enough financial flexibility to carry out our mission."

65.     On September 3, 2005 Blockbuster paid the special distribution of $5 per share to all Blockbuster stockholders.  Blockbuster stock went "ex-dividend" on August 25, 2004.  The payment of the special dividend as pat of Viacom's exchange transaction with plan participants constitutes a prohibited transaction under ERISA.

66.     The special distribution paid on shares of Blockbuster class A common stock held in participant's Plan accounts totaled $4,312,481.

67.     On September 8, 2004 Viacom announced the terms on which it would buy back its own shares in exchange for Blockbuster stock.  Viacom offered 5.15 shares of Blockbuster for each share of Viacom stock, representing a 19% premium over Blockbuster's closing price of $7.90 per share on September 8, 2004.  At the time, Antioco said that, Blockbuster "will be better equipped to achieve [its] goals as an independent, stand alone company rather than as a subsidiary of Viacom."  Because Blockbuster and Antioco had consistently touted Blockbuster stock during 2004 and maintain its stock price at an inflated value, Viacom was able to offer fewer Blockbuster shares for each Viacom share.

68.     The Exchange Offer was made pursuant to the Prospectus, which contained materially false and misleading statements.

69.     The Prospectus stated that Viacom had decided to separate itself from Blockbuster because "[e]ach company believes that the separation of Blockbuster from Viacom will produce numerous corporate benefits to itself and the other company," the most important of which include:

> •      Facilitate Viacom's and Blockbuster's Respective Expansion and Growth.  Viacom and Blockbuster have significantly different competitive strengths and operating strategies, and each company believes that the separation of Blockbuster from Viacom, which is referred to in this Prospectus-Offer to Exchange as the "split-off," will strengthen its ability to

focus its managerial and financial resources on developing and
growing its core businesses.

70.     During the last weeks of September 2004 and through early October 2004,
Antioco and Blockbuster's CFO, Larry Zine were in an investor road show to persuade Viacom
shareholders to swap their shares for Blockbuster stock.

71.     The Viacom Exchange Offer, was over-subscribed, and therefore, in accordance
with the terms of the Viacom Exchange Offer relating to proration, Viacom accepted 9.55% of
the tendered shares, or 27,961,165 shares of Viacom common stock, in exchange for 72 million
shares each of Blockbuster's class A and class B common stock.  In the Viacom Exchange Offer,
approximately 2,121 shares of Viacom class B common stock and approximately 9 shares of
Viacom class A common stock held in participants' Plan accounts were exchanged for 5,486
shares of Blockbuster class A common stock and 5,486 shares of Blockbuster class B common
stock.  This constituted prohibited self-dealing with ERISA.

72.     Almost immediately after the closing of the Exchange, Blockbuster unleashed a
torrent of previously suppressed adverse news; lowered expectations and projections; and
responses to competitive challenges previously planned but not disclosed.  On October 19, 2004,
on the heels of Viacom's exchange of its Blockbuster shares for Viacom shares held by
investors, Blockbuster announced a price ware with Netflix:  when Netflix cuts its monthly
subscription fee to $17.99 per month, Blockbuster cut its price to $17.49 per month.  The price
war continued through 2004 as Blockbuster announced on December 22, 2004 that it would cut
its monthly subscription fee to $14.99 per month.

73.     Shortly after the exchange offer closed, on November 1, 2004 Blockbuster CEO
Antioco, on a conference call with analysts, said that Blockbuster's decline in profitability for
2004 would be worse than the 30% drop he previously forecast.  He attributed the poor results

and grim forecast to a sharper than expected decline in the video rental market, higher spending associated with an accelerated roll out of the chain's online subscription and in-store trading initiatives. Blockbuster warned that profitability would "decline significantly" in the fourth quarter compared with the same period in 2003.

74.     On October 27, 2004 Blockbuster announced its third quarter results in which Blockbuster earned only $3.4 million or $.02 per share compared to the $.12 per share forecast by analysts. It was also announced that profits for the fourth quarter and full year would "decline significantly" and that Blockbuster's COO has resigned.

75.     In conjunction with its third quarter 2004 results, Blockbuster also offered a bleak view of 2005: "the company expects the rental industry to continue to decline in 2005 but believes the rental industry will stabilize by the end of 2005 as DVD penetration is projected to reach 70% of U.S. households. Additionally, the company expects to continue to invest heavily in the business in 2005 which combined with projected declines in rental revenue will adversely affect profitability." At the same time Antioco disclosed that the accelerated deployment of new business initiatives forced Blockbuster to increase its planned investment in 2004 which lowered earnings.

76.     The Company's October 27, 2004 release also provided guidance that was substantially lower than defendants' guidance prior to the Exchange Offer. In this regard, the Release stated, in part, the following:

> Fourth Quarter and Full Year 2004 Business Outlook
>
> The following are the Company's current expectations for the fourth quarter and full year 2004 results of operations.
>
> - The Company expects profitability for the fourth quarter of 2004 to decline significantly from last year based on an estimated low-single digit percentage decline in worldwide same-store revenues, a significant year-over-year increase

in operating expenses associated with the development and launch of the key growth initiatives, an anticipated compensation charge ranging from $60 to $80 million associated with an employee stock option exchange offer and higher interest expense resulting from the assumption of debt as a result of payment of the special distribution to stockholders in September 2004.

- Profitability for the full-year 2004 will decline significantly because of the goodwill impairment charge, the accelerated initiative investment, continued weakness in the rental business, the anticipated charge associated with the employee stock option exchange offer and higher interest expense associated with the additional $950 million in debt. As a result, the Company's prior guidance for an approximately 30% decrease in 2004 diluted earnings per share from adjusted diluted earnings per share of $1.48 for the full-year 2003 is not longer relevant and year-over-year results are not comparable.

77.    On December 14, 2004 Blockbuster announced that it was abolishing all late fees on all its tapes, DVDs, and video games as of January 1, 2005.  In that announcement, Blockbuster for the first time provided estimates of its late fee revenues by stating that late fees would have contributed $250 million to $300 million in 2005.  However, Blockbuster concealed the fact that the roll-out of the program would require Blockbuster to spend tens of millions of dollars and would further weaken Blockbuster's financial position.

78.    On March 9, 2005, Blockbuster issued a news release that announced the Company's financial results for the fourth quarter and year ended December 31, 2005.  For 4Q:04, the Company reported very slim profits, with net income of only $0.9 million.  For the full year, the Company reported a net loss of $1.256.1 billion, or $6.93 per diluted share, compared to a net loss in 2003 of $983 million, or $5.46 per diluted share.  The Company reported free cash flow of $127.9 million down more than 100% from cash flow of $402.7 reported at year-end 2003.

79.    On March 29, 2005, Blockbuster filed its Annual Report on Form 10-K for the year ended December 31, 2004 which reassured investors:

> In October 2004, we completed our divestiture from Viacom, Inc. We believe that we will compete effectively as an independent company and that the separation from Viacom has better positioned as to pursue our unique corporate goals and growth opportunities.

80.    On May 5, 2005, the Company reported a larger then expected loss in the first quarter of 2005 relating, in part, to the launch of the Company's "No Late Fees" program. According to the Company's release, net losses totaled $57.5 million, or $0.31 per share, compared to earnings of $114.4 million, or $0.63 per share, a year ago.  Total revenue during the quarter increased only 3% of $1.55 billion from $1.50 from $1.50 billion last year.  Analysts surveyed by First Call had expected the Company to report losses of $0.28 per share during that period.

81.    On August 9, 2005 Blockbuster reported that second quarter results declined 1.6% compared to the second quarter of 2004.  Blockbuster revealed that the elimination of late fees decreased revenues by about $140 million in the second quarter alone.  By this quarter Blockbuster was so burdened with interest expense from declaration of the special dividend and capital expenses which had been deferred from the time Viacom owned Blockbuster that its free cash flow dropped to negative $118.7 million for the second quarter of 2005 compared to positive $23 million for the second quarter of 2004.

82.    Shares of Blockbuster declined precipitously after the Company reported that it lost $57.2 million in the second quarter, the Company withdrew its full-year forecast, and stated that it had negotiated with lenders to prevent a high debt ratio from triggering default on a line of credit.  On this news, Blockbuster shares fell $0.92, or 11% to close at $7.09 per share on the

NYSE.  In the three months ended June 30, 2005, Blockbuster's loss grew to $0.31 per share, compared with profit of $48.6 million , or $0.27 per share, in the year-earlier, was also below analysts' target of $1.45 billion.

83.     The Company's much-touted decision to eliminated late fees led to a 5% decline in rental revenue, to $1.02 billion.  Late fees plunged from $159 million a year ago to $20.9 million.  Net cash flow provided by operating activities also decreased to $164.7 million, and free cash flow was negative $118.7 million, compared to $268.8 million and a gain of $23.0 million, respectively,  reported in 2Q:04.  In addition, for 2Q:05 gross profits decreased 11.5%, rental gross profits decreased 13.0% and rental gross margins declined by 600 basis points.  The Company attributed these declines to lower gross margins from Blockbuster Online and the decreased revenues attributed to the elimination of late fees and subscription based memberships. Defendants also announced that the Company had raised the cost of its online subscription fees to $17.99, from its previous price of $14.99.

84.     Following these disappointing results, Arvind Bhatia, analyst at Southwest Securities, cut his rating on Blockbuster to "neutral" from "long-term buy."  In issuing this downgrade, Bhatia summed up his conclusions about the Company, in part, by stating that, "Though 2005 was expected to be a throwaway year, our long-term buy rating on BBI was predicated on our belief that 2006 earnings and cash flows would see a 'revival.'  We question that now given the severely negative impact of the new initiatives on the margin side of the company's business."

85.     On September 2, 2005, to conserve cash, Blockbuster announced that it would not declare a quarterly dividend for the third quarter of 2005.

86.     On November 8, 2005, the Company announced in an SEC filing that it could be forced into bankruptcy protection if a credit-pact amendment with creditors did not become effective, and stated that "a very large majority" of its assets already are pledged as collateral on loans and creditors are imposing stricter terms.

87.     The Blockbuster stock purchased with Plan assets is now trading at approximately $3.45 per share.

## V. DEFENDANTS' FIDUCIARY STATUS

88.     Named Fiduciaries.  ERISA requires every plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

89.     De Facto Fiduciaries.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

90.     Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its participants under ERISA in the manner and to the extent set forth in the Plan's documents as detailed herein, through their conduct, and under ERISA.

91.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

92.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, in the separate Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

93.     ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still in fact act solely in the interest of participants and beneficiaries, not in the interest of the sponsor.  Moreover, all Plan fiduciaries were obliged, when wearing their fiduciary hat(s) to act independently of Viacom despite the authority under the governing Plan documents given to Viacom to appoint the VRC and BIC, or to direct the conduct of any of them with respect to the Plan, its investments, or the disclosure of information between and among fiduciaries, or from fiduciaries to the participants.

A.    **The Viacom Defendants' Fiduciary Status**

94.    VRC, Viacom and the BIC appointed by Viacom through Viacom's Board of Director had the authority and discretion to select the investment funds available for the Plan.

95.    Moreover, Viacom and the VRC, at all applicable times, exercised control over the activities of its officers and employees and the BIC in the performance of their fiduciary functions with respect to the Plan, and could hire, terminate, and replace such employees at will. Viacom is thus, responsible for the activities of its officers and employees and members of the BIC appointed by Viacom through principles of agency and *respondeat superior* liability.

96.    Finally, as a matter of law, Viacom is imputed with the knowledge that the VRC and the BIC had of the misconduct alleged herein.

97.    Consequently, in light of the foregoing duties, responsibilities, and actions, Viacom was a fiduciary of the Plan within was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period up to the time of consummation of the Viacom Exchange in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

B.    **The Blockbuster Defendants' Fiduciary Responsibilities**

98.    Blockbuster, its executive officers and directors exercised fiduciary duties in connection with the administration of the Plan through the BRC.  Blockbuster, its executive officers and directors also exercised fiduciary duties through the exercise of their power to appoint, monitor and control members of the BRC and after July 20, 2004, the BIC.

99.    Blockbuster and its directors excused exercised control over the BRC, and after July 20, 2005, the BIC and were therefore fiduciaries with respect to the Plan.

## VI.  DEFENDANTS' RESPONSIBILITIES UNDER APPLICABLE LAW

100.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

101.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

102.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

103.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.